**NUTRITIONAL SUPPORT SERVICES, L.P., and NSS Health Ltd., Plaintiffs,**

v.

**Zell B. MILLER, Governor of the State of Georgia, and Russell Toal, Commissioner, Department of Medical Assistance of the State of Georgia, Defendants.**

Civ. No. 1:92–cv–395–JEC.

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 20, 1993.

Michelle B. Rapoport, Atlanta, GA, John W. Jansak, Nevett Steele, Jr., Towson, MD, for plaintiffs.

William C. Joy, Mary Foil Russell, Office of State Atty. Gen., Atlanta, GA, for defendants.

## ORDER

CARNES, District Judge.

This case is presently before the Court on Plaintiffs' Motion for Summary Judgment [30] and Defendants' Motion for Summary Judgment [32]. The Court has reviewed the record and arguments of the parties and concludes that both motions should be granted in part.

### BACKGROUND

Plaintiffs, Nutritional Support Services, L.P. ("NSS") and NSS Health, Ltd. ("NSS Health"), sell health care products to nursing home residents. (Compl. ¶ 8). Prior to June 1991, Plaintiffs were participating suppliers in the Georgia Medicaid program and received reimbursement for supplies sold to Georgia Medicaid recipients. Under a new policy, however, Georgia requires that suppliers of durable medical supplies have a valid business license and an in-state business location or be located within a fifty mile radius of the state boundary. (*Id.* ¶ 11). Neither Plaintiff meets these requirements, as NSS is a limited partnership that has its principal place of business in Knoxville, Tennessee while NSS Health is a limited partnership organized under California law with its principal place of business in Pennsylvania. (*Id.* ¶¶ 1, 2). Since June 1991, both Plaintiffs have been barred from participating in the state Medicaid program and all claims that they have submitted for payment have been rejected. (*Id.* ¶ 14).

In February 1992, Plaintiffs filed a Complaint against the Governor and the Commissioner of the Department of Medical Assistance, alleging that the new policy violated: (1) the Social Security Act of 1965, as amended, 42 U.S.C. § 1396, *et seq.*, (2) the Equal Protection Clause, (3) the Privileges and Immunities Clause of Article IV, and (4) the Commerce Clause. At the same time they

filed their Complaint, Plaintiffs moved for a Preliminary Injunction to prevent the State from enforcing the new policy. In June 1992, Plaintiffs moved to amend their Complaint and add a claim under 42 U.S.C. § 1983. By Order dated September 15, 1992, this Court granted Plaintiffs' Motion to Amend and denied their Motion for a Preliminary Injunction. By Order dated June 29, 1993 the Court granted in part Defendants' Motion for Summary Judgment, dismissing Plaintiffs' Social Security Act claim and Privileges and Immunities Clause claim, 826 F.Supp. 467. The Court then held a hearing on July 30th on Plaintiffs' Equal Protection and Commerce Clause claims.

## DISCUSSION

### A. Equal Protection

■ Plaintiffs have not alleged that the state's policy involves any suspect classification or fundamental right. Accordingly, the policy will be upheld on equal protection grounds so long as it is rationally related to a legitimate governmental purpose. *Hodel v. Indiana*, 452 U.S. 314, 331, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981).

■ The Court concludes that the State's purpose in establishing the regulation in question—to cut down on administrative costs and protect the citizens of the State—is legitimate. The Court also concludes that the regulation is at least rationally related to this purpose. *See Silver v. Baggiano*, 804 F.2d 1211, 1218–19 (11th Cir.1986) (state policy reimbursing medical doctors but not podiatrists for podiatric services does not violate equal protection clause, even though state did not articulate any reason at all for the policy because policy could be rationally related to several legitimate state interests, such as cutting down administrative costs or encouraging patients to visit only one health care provider). Accordingly, summary judgment is appropriate as to Plaintiffs' equal protection claim.

### B. Commerce Clause

■ The Commerce Clause grants Congress the power to "regulate Commerce ... among the several states." U.S. CONST. art.

1, § 8, cl. 3. The so-called "dormant Commerce Clause" provides that when Congress has not enacted laws that regulate a given area, states retain the authority to regulate matters of legitimate public concern, but may not "discriminat[e] against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Lewis v. B.T. Investment Managers, Inc.*, 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). When Congress does legislate in a given area, however, it may "create[ ] an area in which the States may regulate free from Commerce Clause restraints." *Id.* at 35, 100 S.Ct. at 2015. This is true because, in such a situation, the commerce power of Congress is not dormant but rather has been exercised to authorize state regulation, making such regulation "invulnerable to constitutional attack under the Commerce Clause." *Northeast Bancorp, Inc. v. Board of Governors*, 472 U.S. 159, 174, 105 S.Ct. 2545, 2554, 86 L.Ed.2d 112 (1985).

■ In the Social Security Act, Congress required that states "provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19). Further, states are allowed to set reasonable standards for the qualification of providers. 42 U.S.C. § 1396a(a)(23); 42 C.F.R. § 431.51(b)(c)(2). The State asserts that the purpose of the restrictions challenged in this case is to allow Defendants to exercise a degree of control over suppliers in order to enable them to protect recipients and properly allocate scarce public resources. (Br. in Supp. of Mot. for Summ.J. at 8). Thus, the State argues, the regulation is authorized by 42 U.S.C. §§ 1396a(a)(19) & (23) and is invulnerable to Commerce Clause attack. (Def.s' Supp'l Br. at 2–6).

The Court disagrees with the State's assertion that this case does not present a dormant commerce clause situation. As the Supreme Court's recent caselaw makes clear, "because of the important role the Commerce Clause plays in protecting the free flow of

interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been '*unmistakably clear*.'" *Maine v. Taylor*, 477 U.S. 131, 138–39, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986) (emphasis added); *see also Wyoming v. Oklahoma*, —— U.S. ——, ——, 112 S.Ct. 789, 802, 117 L.Ed.2d 1 (1992) ("Congress must manifest its *unambiguous intent* before a federal statute will be read to permit or to approve ... a violation of the Commerce Clause ...") (emphasis added); *Northeast Bancorp*, 472 U.S. at 174, 105 S.Ct. at 2554 ("When Congress so chooses, state actions which it *plainly authorizes* are invulnerable to constitutional attack under the Commerce Clause.") (emphasis added). The Court concludes that the general language in the statutes in question simply does not make it "unmistakably clear" that Congress intended to allow state regulations that otherwise violate the Commerce Clause.[1]

■ In determining whether a state has violated the Commerce Clause, the Supreme Court has distinguished between two different types of statutes—those that burden interstate commerce only incidentally and those that affirmatively discriminate against interstate commerce. *Maine v. Taylor*, 477 U.S. at 138, 106 S.Ct. at 2447. While statutes in the former group violate the Commerce Clause only if they impose a burden on interstate trade that is "clearly excessive in relation to the putative local benefits," *id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)), those in the latter group are subject to more demanding scrutiny. *Id.* Thus, "once a state law is shown to discriminate against interstate commerce 'either on its face or in practical effect,' the burden falls on the State to demonstrate both that the stat-

ute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Id.*

In its Motion for Summary Judgment, the State invokes the standard for incidental burdens on interstate commerce. (Br. in Supp. of Def.s' Mot. for Summ.J. at 12). The Court concludes, however, that while the policy at issue arguably may be facially neutral (*i.e.*, both those inside the fifty mile limit and those outside the limit must have a valid business license and a business location within the fifty mile limit), at a minimum, the "practical effect" of the policy is to discriminate against providers outside of the fifty mile limit. *See, e.g., Ga. Ass'n of Realtors v. Ala. Real Estate Com'n*, 748 F.Supp. 1487, 1493–94 (M.D.Ala.1990) (applying test for discriminatory statutes to in-state office requirement); *Underhill Assoc., Inc. v. Coleman*, 504 F.Supp. 1147, 1151 (E.D.Va.1981) ("While the [in-state office] requirement is facially neutral, its obvious effect is prejudicial to out of state brokers, who must duplicate the expense of maintaining an office in Virginia in order to do business with its residents."). Accordingly, the regulation is permissible only if the State carries its burden of showing both that the policy promotes a legitimate state interest and there are no less burdensome means of accomplishing this purpose.

■ As the Supreme Court has observed, statutes that affirmatively discriminate against interstate commerce "invoke[ ] the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Hughes v. Oklahoma*, 441 U.S. 322, 337, 99 S.Ct. 1727, 1737, 60 L.Ed.2d 250 (1979). The State apparently believes that its lack of a protectionist motivation should be dispositive, as it argues that the regulation "is not the type of protection-

---

1. *See, e.g., Wyoming v. Oklahoma*, —— U.S. at ——, 112 S.Ct. at 802 (savings clause of Federal Power Act, which reserves to states the regulation of local retail electric rates, does not exempt from Commerce Clause scrutiny Oklahoma law that required state utilities to burn at least 10% Oklahoma-mined coal); *Maine v. Taylor*, 477 U.S. at 139–40, 106 S.Ct. at 2447–48 (legislative history of Lacey Act Amendments that provided that states were to be encouraged to protect species did not remove from Commerce Clause

analysis state law prohibiting importation of live baitfish); *cf. Northeast Bancorp*, 472 U.S. at 174, 105 S.Ct. at 2553–54 (Douglas Amendment, which prohibited Federal Reserve Board from approving bank holding company's application to acquire bank located in another state unless acquisition is specifically authorized by law of state in which such bank is located, clearly authorized state laws that selectively allow interstate bank acquisitions on regional basis.)

ist legislation the Commerce Clause has been held to prohibit." (Defs.' Supp'l Br. at 7). The Supreme Court, however, has noted that a state's purpose in establishing a rule is irrelevant to the Commerce Clause issue as "the evil of protectionism can reside in legislative means as well as legislative ends." *City of Philadelphia v. New Jersey,* 437 U.S. 617, 626, 98 S.Ct. 2531, 2536–37, 57 L.Ed.2d 475 (1978).

■ For purposes of this Order, the Court will accept the State's argument that the objective the regulation seeks to advance—that of reducing the administrative costs of the Medicaid program and protecting the citizens of Georgia—is a legitimate one. "[A] finding that state legislation furthers matters of legitimate local concern, even in the health and consumer protection areas, does not end the inquiry," however *Hunt v. Washington State Apple Advertising Com'n,* 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977). As noted in the only two other federal court decisions that have addressed the validity of an in-state office requirement under the Commerce Clause, the cost to an out of state business of maintaining an in-state office imposes a considerable burden on interstate commerce.[2] *Ga. Ass'n of Realtors,* 748 F.Supp. at 1493; *Underhill,* 504 F.Supp. at 1151–52.

Moreover, as both courts have also observed, less burdensome means often exist to achieve the purpose that an in-state office requirement is intended to accomplish. *Ga. Ass'n of Realtors,* 748 F.Supp. at 1494 (Commerce Clause violated because state's interest in having access to records for unannounced audits can be served by less burdensome measures than requiring in-state business office); *Underhill,* 504 F.Supp. at 1152 ("[T]he Court finds that there are less discriminatory and burdensome means [than in-

state office requirement] of ensuring that the necessary records are made available."); *see also Frazier v. Heebe,* 482 U.S. 641, 649, 107 S.Ct. 2607, 2613, 96 L.Ed.2d 557 (1987) (Federal district court rule requiring attorneys to maintain in-state office to practice law in district court is "unnecessary and irrational.").

Similarly, this Court concludes that the State's policy of requiring an office within fifty miles of the state border is not the least burdensome means of reducing administrative costs and protecting Georgia citizens. By way of example, a requirement that durable medical suppliers maintain in-state (or, perhaps, within fifty miles) copies of documentation to support Medicaid claims would appear to be less burdensome and would appear to accomplish the stated purpose. Indeed, such a requirement arguably accomplishes the auditing purpose purportedly underlying the rule better than the current regulation, as the latter does not require that suppliers maintain such documentation at their in-state office.[3] The establishment of an in-state office, without a requirement that this office maintain records necessary for an audit by the state, would appear to further little, if any, of the regulation's purported objectives. Yet, it would appear that an in-state office without records would comply with the regulation.

Because the regulation at issue discriminates against interstate commerce and is not the least burdensome means of accomplishing its stated purpose, it violates the Commerce Clause.[4] Accordingly, Plaintiff's Motion for Summary Judgment is granted as to their Commerce Clause claim.

### CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment [30] is **GRANT-**

---

2. Although the office requirement at issue here is not technically an "in-state" requirement as the office may also be within fifty miles of the state border, the Court concludes that such an "in-state plus fifty miles" requirement imposes a burden on interstate commerce that is nearly identical to that imposed by an in-state requirement.

3. *See Ga. Ass'n of Realtors,* 748 F.Supp. at 1493–94; *Underhill,* 504 F.Supp. at 1152.

4. The State has expressed concern that any ruling issued in this case may also be applied to health care providers. In response to the State's concern, the Court observes that its ruling applies only to the case before it—the constitutionality of the regulation regarding suppliers of durable medical products. The Commerce Clause analysis may be different in the case of health care providers.

ED IN PART and **DENIED IN PART** and Defendants' Motion for Summary Judgment [32] is **GRANTED IN PART** and **DENIED IN PART.**

SO ORDERED.